## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LYNN E. SNYDER

v.

MARYLAND DEPARTMENT OF
TRANSPORTATION, *et al.*

Civil Action No. CCB-21-930

### MEMORANDUM

Lynn E. Snyder brought the present action against her former employer, the Maryland Department of Transportation State Highway Administration, and her former supervisors, Darion Branham and Daniel Houck (collectively, "the defendants"). Snyder alleges the defendants interfered with her statutory right to take medical leave, while also discriminating against her on account of her gender, disability, and age. In doing so, Snyder contends the defendants violated a host of federal and state anti-discrimination laws.

Now pending before the court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. (Defs.' Mem. Supp. Summ. J., ECF No. 12.) The issues have been fully briefed, with Snyder filing an Opposition (Pl.'s Mem. Opp. Summ. J., ECF No. 21), and the defendants filing a Reply (Defs.' Reply Supp. Summ. J., ECF No. 27). The motion is ripe for disposition, and no hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, the court will grant the defendants' Motion, which it construes as a motion for summary judgment.[1]

---

[1] Snyder offers in several instances to amend her Complaint. As described more specifically in the relevant sections, an Amended Complaint with the facts Snyder proffers would still not permit her claims to survive summary judgment. Accordingly, Snyder's requests for leave to amend are denied.

1

## BACKGROUND

Plaintiff Lynn E. Snyder[2] spent years working for the Maryland Department of Transportation State Highway Administration ("Department"), where she was an Administrative Assistant in the Department's Westminster, Maryland shop (Compl. ¶ 11, ECF No. 3.) The shop is responsible for designing and maintaining Maryland's highways, which includes clearing roadways when it snows. (Defs.' Mem. at 1; Compl. ¶ 45.) The present dispute began on February 13, 2019, when Snyder allegedly noticed a Department employee had submitted a timecard with incorrect information. (Compl. ¶ 15.) As an Administrative Assistant, Snyder was responsible for preparing the payroll which inspired her to keep a watchful eye over "the comings and goings" of other employees. (*Id.* ¶ 16.) Believing the employee was being paid for work not actually performed, she reported the situation to management. (*Id.* ¶ 18.)

In this conversation, Snyder spoke with Defendant Darion Branham, head of the shop and Snyder's superior. (*Id.* ¶ 18.) Branham was a new employee, having only worked at the shop for approximately a month. (*Id.*) After reporting her suspicions to Branham, Snyder uneventfully returned to her desk. (*Id.*) Later that day, Snyder was called back into Defendant Branham's office, where Branham allegedly questioned her "more aggressively." (*Id.* ¶¶ 19–20.)

The next day, Snyder's direct supervisor, Andrew Antlitz, allegedly requested to speak with her about the timecard issue. (*Id.* ¶ 21.) While she was speaking with Antlitz, Branham entered the room and allegedly began shouting about Snyder's timecard concerns. (*Id.* ¶ 22.) Snyder alleges she became ill after this meeting, and she requested leave later in the afternoon. (*Id.* ¶ 24.) Snyder contends the interaction was especially distressing because of her status as a battered spouse. (*Id.* ¶ 23.) Branham allegedly took a "mean-spirited" approach regarding Snyder's request

---

[2] Plaintiff was formerly known as Lynn E. Ajster. Plaintiff changed her name to Lynn E. Snyder during this litigation. (Compl. ¶ 11.)

2

for leave, but "he did ultimately grant the leave." (*Id.* ¶ 25.)

Snyder had already arranged to have the next five days off from work to visit her family. (*Id.* ¶ 28.) Snyder, however, still felt ill on February 20, 2019, the day she originally planned on returning to work. (*Id.* ¶ 31.) Instead of returning to work, Snyder called in sick and saw her primary care doctor and a mental health professional. (*Id.* ¶ 31.)

According to Snyder, she alerted the Department's Westminster shop of her need for medical leave during this time. (*Id.* ¶ 31.) The Department contends Snyder never applied for leave under the applicable statute. In support, the defendants submit the sworn affidavit of Stacy Custer, the Administrative Chief responsible for Snyder's shop (Defs.' Mem. Supp. Summ. J. Ex. A, Custer Aff., ECF 12-2), and Rhonda Truitt, the Division Chief of the Benefits Services Division (Defs.' Mem. Supp. Summ. J. Ex. B, Truitt Aff., ECF 12-3.) There is no record of Snyder applying for leave under the Family and Medical Leave Act during the relevant time of this dispute. (*Id.* ¶¶ 5–6.) On February 28, 2019, the Department sent forms inquiring about Snyder's eligibility for leave under the Family and Medical Leave Act. (Custer Aff. ¶ 5.) These inquiries were sent to Snyder's home address via certified and first-class mail, but ultimately returned to the Department unclaimed. (*Id.* ¶¶ 5–7.)

Meanwhile, Snyder returned to the shop on March 4, 2019. (Compl. ¶ 42.) Several members of management, including Branham, met with Snyder to discuss why she did not report to work during a weather emergency on March 3, 2019. (Defs.' Mem. Supp. Summ. J. Ex. D, Pierson Aff. ¶ 3, ECF 12-5; Compl. ¶ 43.) During their discussion, however, Snyder "pulled out her cell phone and informed [Branham] she was recording the meeting." (Pierson Aff. ¶ 3.) Branham left the meeting to contact the Department's Employee/Employer Relations Office ("EER"). (*Id.* ¶¶ 3–4.) EER recommended informing Snyder of the potential disciplinary action

she may face due to insubordination if she does not stop recording conversations in the workplace. (*Id.* ¶ 3.)

Branham returned to the meeting, but Snyder "again stated that she was recording the meeting." (*Id.* ¶ 4.) She "refused to respond to Mr. Branham's questions about her failure to respond to the snow emergency call over the weekend." (*Id.*) Snyder was given the opportunity to write responses to the questions about her absence and return them the following day. (*Id.* ¶ 5.) Snyder declined to do so. (*Id.* ¶ 5.) Several members of management as well as an HR representative were present for the meeting and verified this account. (*Id.*)

Three days later, on March 11, 2019, Branham contacted EER again, reporting that "Snyder's negative behaviors were escalating towards management and causing a disruption in the office." (*Id.* ¶ 7.) EER asked Daniel Houck, an Assistant District Engineer who had no prior relationship with Snyder, to schedule a mitigating conference with Snyder to discuss her missed time during the snow emergency as well as general insubordination. (*Id.* ¶ 8.) When Snyder met with Houck on March 12, 2019, she again threatened to record the conversation. (*Id.* ¶ 9.) She informed Houck "she was done talking to management." (*Id.*) "She proceeded to tell management to write her up, fire [her], [or do] whatever they need to." (*Id.*)

The Department obliged. The next day, March 13, 2019, EER recommended Snyder's termination due to insubordination. (*Id.* ¶ 10.) The MDOT/SHA Administrator and the Deputy Administrator approved the recommendation. (*Id.*) While the Charges for Termination documents were being drafted, EER received yet another report on March 15, 2019, detailing Snyder's "negative attitude toward management." (*Id.* ¶ 11.) According to Branham, Snyder's attitude was "escalating to the point of causing frequent disruptions in the front office." (*Id.*) On March 18, 2019, Houck met with Snyder for another "mitigating circumstance conference" to discuss her

4

"unprofessional and inappropriate" workplace conduct. (*Id.* ¶ 12.) This, evidently, was to allow Snyder the opportunity to "tell her side of the story." (*Id.*) Snyder refused, proclaiming "she'll see [the Department] in court." (*Id.*)

Snyder received a Suspension Pending Termination that same day. (*Id.* ¶ 13.) Four days later, on March 22, 2019, Snyder was served Charges for Termination documents. (*Id.* ¶ 14.) The documents note "Snyder was terminated for (1) having committed an act of misconduct or a serious breach of discipline; (2) her action or inaction amounted to insubordination; (3) her failure to obey a lawful and reasonable direction given by a supervisor or a superior; and (4) the violation of a statute, regulation, executive order, written policy, written directive, or written rule." (*Id.*)

On September 18, 2019, Snyder filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 62.) Over the following year, Snyder satisfied the requisite administrative requirements to bring the present action. (*Id.* ¶¶ 62–67.)[3] Snyder's pleadings allege she expressed concern "she was being harassed and discriminated against" in her prior meetings with management. (*Id.* ¶ 48.) Snyder alleges she was the oldest worker in the shop and was asked when she intended to retire. (*Id.* ¶ 50.) Snyder contends there were just three women in the Westminster shop (*Id.* ¶ 53), while alleging men in the shop miss storms due to illness yet remain employed. (*Id.* ¶ 56.)

Snyder subsequently appealed her termination to the Maryland Office of Administrative Hearings. (Pl.'s Mem. Opp. at 3.) Then, Snyder appealed to the Circuit Court for Carroll County. (*Id.*) Finally, after yet another appeal, her termination is now pending before the Maryland Court of Special Appeals. (*Id.*)

---

[3] Specifically, the EEOC issued a reasonable cause determination with respect to potential violations of Title VII and the ADA. (Compl. ¶ 63.) The Maryland State Treasurer took no action in response to Snyder's notice related to her tort claims, permitting Snyder to litigate those claims in court. (*Id.* ¶ 64.) The EEOC also issued Snyder a Notice of Right to Sue under the Age Discrimination in Employment Act. (*Id.* ¶ 65.)

Separately, Snyder commenced the present action in the Circuit Court for Carroll County, Maryland. (ECF No. 1.) Snyder asserts a litany of different claims within the following categories: violations of the Family and Medical Leave Act, discrimination based on disability, age, and gender, as well as common law tort claims.[4] The defendants filed a timely notice of removal under 28 U.S.C. § 1446, as well as the present Motion to Dismiss, or in the Alternative, for Summary Judgment. The court, possessing jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, will analyze each of Snyder's claims in turn.

## LEGAL STANDARD

### I. Converting a Motion to Dismiss into a Motion for Summary Judgment

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion with this caption implicates the court's discretion under Fed. R. Civ. P. 12(d). *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011).

Courts generally do not consider issues "outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Courts may, however, consider matters outside the pleadings under the discretionary authority outlined in Rule 12(d). Once the court considers material beyond the pleadings, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Bosiger*, 510 F.3, 442, 450;

---

[4] Specifically, Snyder brings the following claims: retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count I), interference in violation of the FMLA (Count II), disability discrimination in violation of the Maryland Fair Employment Practices Act (hereinafter "Maryland's FEPA") (Count III), disability discrimination in violation of § 504 of the Rehabilitation Act (Count IV), disability discrimination in violation of the Americans with Disabilities Act (hereinafter "ADA") (Count V), age discrimination in violation of Maryland's FEPA (Count VI), age discrimination in violation of the Age Discrimination in Employment Act (hereinafter "ADEA") (Count VII), gender discrimination in violation of Maryland's FEPA (Count VIII), gender discrimination in violation of Title VII (Count IX), retaliation in violation of Maryland's FEPA (Count X), retaliation in violation of § 504 of the Rehabilitation Act (Count XI), retaliation in violation of the ADA (Count XII), retaliation in violation of the ADEA (Count XIII), retaliation in violation of Title VII (Count XIV), intentional infliction of emotional distress (hereinafter "IIED") (Count XV), and negligent supervision and/or negligent retention (Count XVI).

*Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003).

"There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is aware "material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (noting a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Balt.*, 721 F.3d at 281.

The present dispute meets both requirements, and the court will evaluate the defendants' motion as one for summary judgment. First, Snyder had adequate notice the present motion may be treated as a motion for summary judgment. The motion's alternative caption and attached materials are sufficient to satisfy the notice requirement. *See Laughlin*, 149 F.3d at 260–61. Moreover, Snyder referred to the motion in her Opposition as one for summary judgment (Pl.'s Mem. Opp. at 1, 29), and even introduced additional allegations beyond the pleadings (*id.* at 32) in response to the defendants' motion. Both actions reflect her subjective awareness that the motion could be construed as a motion for summary judgment.[5]

---

[5] Snyder asserts the defendants "only seem to be seeking summary judgment with respect to the issue of age discrimination." (Pl.'s Mem. Opp. at 3.) The court disagrees with Snyder's interpretation. The defendants' motion begins and ends with a request for the court to grant summary judgment in the alternative. (Defs.' Mem. at 4, 22–23, 38.) Furthermore, the defendants consistently cite their attached exhibits—which generally cannot be considered on a 12(b)(6) motion—in response to several of Snyder's claims, not just those related to age discrimination. (*Id.* at 5, 9, 15–16, 24, 30–31, 34, 35–36.) Finally, Snyder's assumption the defendants were *only* seeking summary judgment with respect to the age discrimination claim is incorrect as a matter of law. Once the court accepts matters outside the pleadings, the court *must* convert the motion to one for summary judgment. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2018) ("Once the district court decides to accept matters

7

Second, Ms. Snyder had a reasonable opportunity for discovery. Rule 56(d) affords a plaintiff the chance to seek further discovery by filing an appropriate affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Balt.*, 721 F.3d at 281 ("[The defendant] took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])). Snyder failed to file a Rule 56(d) affidavit requesting further discovery.[6] This failure to file an affidavit specifying legitimate needs for discovery "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)). A nonmoving party "cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

At first blush, evaluating Snyder's claims under the standard for summary judgment before any formal discovery proceedings may appear harsh. Indeed, some case law highlights the

---

outside of the pleadings, the presence of the word 'must' [formerly 'shall'] in subdivision (d) of Rule 12 indicates that the judge *must* convert the motion to dismiss into one for summary judgment.").

[6] The Fourth Circuit places "great weight" on the affidavit requirement. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir.1996). At the same time, however, the Fourth Circuit has "not always insisted" on a formal affidavit and has excused non-compliance with Rule 56(d) "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Even assuming this more relaxed standard applied, Snyder would fail to meet it. Snyder's passing references implying the need for further discovery—generally buried in footnotes and parentheticals—are insufficient to adequately inform the court *why* summary judgment is premature. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (noting the plaintiff's "numerous vague assertions" regarding the need for further discovery were not an adequate substitute for a Rule 56(d) affidavit).

heightened need for discovery in employment discrimination disputes "where the main issue is one of motive" and the "key evidence lies in the control" of the moving party. *See McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014).[7] But this concern for parity in evidentiary access is not compelling when applied to the present dispute. Snyder herself touted the breadth of the record *already developed* by the parties in prior proceedings, which included "sworn hearing testimony and document production." (Pl.'s Mem. Opp. at 3.) By Snyder's own admission, the parties became "quite familiar with each other and the facts" of the dispute based on several fact-finding hearings and appeals. (*Id.*) Snyder's failure to seek discovery under Rule 56(d), combined with her prior opportunity to develop the factual basis of her claims, is sufficient to satisfy the second requirement for converting the present motion. Therefore, the court will consider the additional materials submitted by the parties and will treat the defendants' motion as a motion for summary judgment.

## II. Legal Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

---

[7] *McCray* is inapposite to the present case. There, the Fourth Circuit was evaluating a situation where the plaintiff, in fact, filed a Rule 56(d) affidavit requesting additional discovery. *See McCray*, 741 F.3d at 482. Snyder filed no such affidavit in the present case.

properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I.    The Family and Medical Leave Act

The Family and Medical Leave Act ("FMLA") allows "employees to take reasonable leave for medical reasons[.]" 29 U.S.C. § 2601(b)(2). When applicable, the law "entitles eligible employees to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons, *see* 29 U.S.C. § 2612(a)(1), and ensures that these employees will be restored to their same or an equivalent position upon returning to work, *see id.* § 2614(a)(1)." *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 381–82 (4th Cir. 2001).

The FMLA creates two types of claims. The first includes interference claims, which hold an employer liable for "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" any right protected by the statute. 29 U.S.C. § 2615(a)(1). In other words, interference claims involve alleged violations of the FMLA's "prescriptive" rights, which set "substantive floors for conduct by employers, and creat[e] entitlements for employees." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (citation omitted). The second is based on retaliation; these claims involve the FMLA's "proscriptive" rights, which prohibit an employer

10

from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by" the FMLA. *Id.* (quoting 29 U.S.C. § 2615(a)(2)). Specifically, employers may not "retaliat[e] against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). These provisions provide "a cause of action for retaliation." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009). The court will address each of these claims in turn.

### A.   *Interference Claim*

To establish an FMLA interference claim, an employee must prove (1) she is entitled to an FMLA benefit; (2) her employer interfered with the provision of that benefit; and (3) that interference caused harm. *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).[8]

No reasonable jury could resolve Snyder's interference claim in her favor for the following reasons. First, Snyder did not provide the defendants with adequate notice regarding her absence. "An employee is mandated to provide notice to her employer when she requires FMLA leave." *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 382 (4th Cir. 2001). "Where the need for leave is unforeseeable, 'an employee should give notice to the employer . . . as soon as practicable under the facts and circumstances of the particular case.'" *Id.* (citing 29 C.F.R. § 825.303(a)). This notice must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA" when providing notice. *Id.* However,

---

[8] Different iterations of this test organize the elements in a slightly different manner. *See, e.g.*, *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 495 (D. Md. 2013) (citing *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008)) ("To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. The employee also must prove that the violation prejudiced her in some way.") (internal citations and quotation marks omitted).

"[a]n employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." *Id.*

After Snyder had been out of the office for five consecutive days, the Department sent her FMLA designation materials via certified and first-class mail. (Custer Aff. ¶ 5.) The forms were returned to the Department unclaimed. (*Id.* at ¶¶ 5–7.) An unrebutted affidavit attests Snyder had not applied for leave under the FMLA in the year encompassing this dispute. (Truitt Aff. ¶¶ 5–6.) Snyder's only response is to rest on her pleadings. She points to her Complaint, alleging she alerted the Department of her "required medical leave due to her disabling health condition." (Compl. ¶ 37.)

Even assuming Snyder *initially* provided the Department with proper notice, Snyder has not meaningfully disputed the Department's contention that she failed to respond to the necessary inquiries regarding the status of her leave. At most, Snyder rebuts the Department's affidavits with a mere footnote in her Opposition arguing she "knew nothing at all about any FMLA paperwork, and never received it." (Pl.'s Mem. Opp. at 16.) Missing from Snyder's response, however, is any sort of evidence responsive to the Department's motion for summary judgment.

Snyder's problem, as is the case for each of her claims in this dispute, is her sole reliance on pleadings to generate a genuine dispute of material fact. Pleadings are not sufficient to defeat a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) & (B); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of [their] pleading . . . [i]nstead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[T]he non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like,

12

respond to the motion."); *Vorleamesi v. Esper*, 2021 WL 3681163, at *4 (D. Md. Aug. 19, 2021) ("[I]t is hornbook law that reliance on a complaint is insufficient to oppose a motion for summary judgment.").[9]

The court is left with unrefuted, sworn evidence demonstrating that the Department sent Snyder explicit inquiries regarding her eligibility for FMLA leave, and those requests went unanswered. (Truitt Aff. ¶¶ 5–6.) Even assuming *arguendo* Snyder did not, in fact, receive the FMLA forms, the outcome is no different. A separate sworn affidavit notes Snyder "refused to respond to [her supervisor's] questions about her failure to respond to [a] snow emergency call over the weekend." (Pierson Aff. ¶ 4.) Snyder's refusal to explain the reasons for her leave entitles the Department to summary judgment. A plain reading of the relevant regulation is instructive: "[f]ailure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection . . . ." 29 C.F.R. § 825.303(b). Other jurisdictions have found employees are not protected under the FMLA when they fail to respond to this type of request. *See, e.g.*, *Law v. Kinross Gold U.S.A., Inc.*, 651 F. App'x 645, 648 (9th Cir. 2016) (affirming grant of summary judgment where an employer delivered a letter requesting additional information regarding the plaintiff's qualification for FMLA leave, but the plaintiff did not return the information by the deadline); *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 230 (D.N.J. 2015) (granting summary judgment where plaintiff failed to respond to employer's FMLA inquiry).

Second, even if Snyder's failure to respond is excused, Snyder was never *actually* denied FMLA benefits. By her own admission, Snyder's supervisor "ultimately grant[ed] the leave" she requested. (Compl. ¶ 25.) Snyder's best argument is that her supervisor "took a very mean-spirited

---

[9] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

approach regarding her request." (*Id.*) But a tepid response to an employee's request for leave does not rise to the level of interference under the FMLA. The statute requires more. Namely, the plaintiff must show a causal connection between the alleged violation and prejudice experienced by the plaintiff. *See Wonasue*, 984 F. Supp. 2d at 495 (granting summary judgment because the plaintiff did "not claim that she incurred any losses, monetary or otherwise" resulting from the purported interference). And the Fourth Circuit has held that a plaintiff must demonstrate "verbal and written reprimands *in fact* discouraged [the plaintiff] from taking FMLA leave." *Adams*, 789 F.3d at 429 (4th Cir. 2015) (rejecting interference claim where the plaintiff faced verbal attacks but in fact took leave); *see also Downs v. Winchester Med. Ctr.*, 21 F. Supp. 3d 615, 619 (W.D. Va. 2014) ("[B]ecause [the plaintiff] has failed to allege that she was *actually denied* any FMLA benefits, [she] has failed to allege any prejudice related to FMLA interference.") (emphasis added).[10]

### B. Retaliation Claim

To succeed on a retaliation claim, a plaintiff must first establish a *prima facie* case showing (1) "[s]he engaged in protected activity," (2) "the employer took adverse action against h[er]," and (3) "the adverse action was causally connected to the plaintiff's protected activity." *Yashenko*, 446 F.3d at 551 (citation omitted).[11] The burden then shifts to the employer to offer a "non-discriminatory explanation for her termination." *Id.* If the employer does so, the plaintiff must then

---

[10] The defendants also point out Snyder "has not alleged sufficient facts to establish that she was an eligible employee." (Defs.' Mem. at 3.) For example, the defendants note Snyder failed to allege she worked the requisite number of hours to qualify for FMLA leave. (*Id.* at 5.) An "eligible employee" is an individual who has been employed: "(i) for *at least 12 months* by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for *at least 1,250 hours of service* with such employer *during the previous 12–month period.*" 29 U.S.C. § 2611(2)(A) (emphases added). Snyder requests leave to amend the Complaint to add this fact. (Pl.'s Mem. Opp. at 15.) Snyder's request is denied because adding this fact would not permit the claim to survive. Amendment would therefore be futile.

[11] Retaliation claims under the FMLA are analogous to those derived under Title VII and so are analyzed under the *McDonnell Douglas* burden-shifting framework. *Yashenko*, 446 F.3d at 550–51.

show the employer's proffered explanation was mere pretext for FMLA retaliation. *Id.* (citation omitted).

Snyder argues the Department terminated her in retaliation for asserting rights under the FMLA. Even assuming she could establish a *prima facie* case, Snyder has not provided any evidence suggesting the Department's proffered explanations for her termination were pretextual.

The Department, on the other hand, offers a cogent, non-discriminatory, and unrefuted theory of Snyder's termination. According to the Department's affidavits, Snyder was terminated after multiple instances of insubordination, including those where she recorded or threatened to record management. (Pierson Aff. ¶ 15.) Impermissibly recording conversations is a legitimate and non-discriminatory ground to terminate employment. *See Bartee v. Morris*, 149 F.3d 1167 (4th Cir. 1998) (affirming grant of summary judgment where employee violated workplace rule against recording conversations); *see also Barnes v. Sec'y, Dep't of Health & Hum. Servs.*, 2000 WL 978733, at *5 (D. Md. July 14, 2000), *aff'd*, 238 F.3d 410 (4th Cir. 2000) (same). Additionally, Snyder refused to provide an explanation for her absence during an extreme weather event, despite being given multiple opportunities to do so. (Pierson Aff. ¶¶ 3–5.) The Department's Employee/Employer Relations Office received reports that "Ms. Snyder's negative behaviors were escalating toward management and causing a disruption in the office." (*Id.* ¶ 7.) Snyder even went so far as to challenge the defendants to "write her up, fire [her], [or do] whatever they need to." (*Id.* ¶ 9.) Insubordination is a legitimate, nondiscriminatory reason for discharge. *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).

In sum, Snyder has not offered any evidence rebutting the Department's characterization of her actions. As such, the court will grant summary judgment on the retaliation claim against

each defendant.[12]

## II. Disability Discrimination Claims

Snyder's disability discrimination claims fare no better. The Americans with Disabilities Act ("ADA") prohibits discrimination against an otherwise qualified individual with a disability based on their disability. 42 U.S.C. § 12112(a).[13] Snyder's primary ADA claim alleges the defendants harassed and terminated her after she took leave due to her mental and physical ailments. (Compl. ¶ 116.) "To survive summary judgment on the primary ADA claim, [a plaintiff] [is] required to produce evidence sufficient to demonstrate that (1) [s]he "was a qualified individual with a disability"; (2) [s]he "was discharged"; (3) [s]he "was fulfilling h[er] employer's legitimate expectations at the time of discharge"; and (4) "the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012).

Even assuming Snyder's ailments constitute a disability, Snyder has failed to produce any evidence demonstrating she was fulfilling her employer's legitimate expectations when she was fired. Plaintiffs may satisfy the third element by offering evidence as to (1) "[their] job performance" and (2) "whether [their employer] considered [them] a satisfactory employee." *See Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 623–24 (D. Md. 2014) (granting

---

[12] The parties dispute whether the FMLA establishes individual liability for public sector employees. The court need not decide the issue, but notes this question remains open in the Fourth Circuit. *See Ensor v. Jenkins*, 2021 WL 1139760, at *33 (D. Md. Mar. 25, 2021) ("In 2014, District Judge J. Frederick Motz observed that the Fourth Circuit had yet to opine on whether the FMLA creates a cause of action for money damages against individual supervisors at public agencies . . . . And, to my knowledge, it remains so to this day. Moreover, a circuit split exists as to this issue.")

[13] Snyder brings substantially similar claims under analogous statutes, such as the Maryland FEPA and the Rehabilitation Act. The differences between those statutes and the ADA do not change the outcome here. *See Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 239 (2016) (listing the elements of a disability discrimination claim based on an allegedly unlawful termination under the Maryland FEPA, which generally mirror those under federal disability statutes) (citing Md. Code Ann., State Gov't § 20-606(a)(1)); *Hooven–Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001) (outlining the standard for retaliation claims under the Rehabilitation Act, which adopts the ADA's substantive provisions).

motion to dismiss); *see also Johnson v. Merchants Terminal Corp.*, 2017 WL 1546429, at \*13 (D. Md. Apr. 27, 2017) (granting summary judgment to employer on the same basis).

Snyder offers nothing of the sort. The defendants, on the other hand, proffer sworn affidavits detailing their perception of Snyder's insubordinate behavior in the workplace. (Pierson Aff. ¶ 3.) As described above, Snyder threatened to record conversations in the workplace while also refusing to cooperate with the defendants' investigation into her absence during a weather emergency. (*Id.*)

For the reasons detailed above, no jury could reasonably infer Snyder's discharge was the result of discrimination based on her disability. Snyder has not even alleged—much less substantiated with evidence—that she had disclosed her disability status to *anybody* at the Department. Multiple sworn affidavits attest Snyder never requested any accommodations or disclosed any impairment. (Defs.' Mem. Supp. Summ. J. Ex. A, Custer Aff., ECF 12-2; Ex. C, Dade Aff., ECF 12-4.)

Furthermore, Snyder has entirely ignored the legitimate non-discriminatory justification for her termination described above. The court will grant summary judgment as to the claims under the ADA, Rehabilitation Act,[14] and the analogous state law statutes.

---

[14] Elements of claims brought under the ADA and Rehabilitation Act "are generally construed to impose the same requirements." *Betts v. Rector & Visitors of Univ. of Va.,* 145 F. App'x 7, 10 (4th Cir. 2005). However, under the ADA, "a plaintiff need only prove discrimination by reason of disability." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 370 (D. Md. 2011). Under Section 504 of the Rehabilitation Act, a plaintiff arguably must demonstrate that discrimination occurred "solely by reason of" their disability. *See Kerrigan v. Bd. of Educ. of Carroll Cty.*, 2016 WL 470827, at \*4 (D. Md. Feb. 8, 2016). However, "[t]his Court's identification of the causation standard in Section 504 employment discrimination claims has varied." *Bozarth v. Maryland State Dep't of Educ.*, 2021 WL 1225448, at \*15 (D. Md. Mar. 31, 2021). "At times, the Court has cited Section 504's 'solely by reason of' standard." *Id.* (internal citations omitted). "Yet, at other times, the Court has referenced Title I's lower 'because of' standard when evaluating a Section 504 claim based on employment discrimination." *Id.* (internal citations omitted). Snyder has failed to meet her burden of demonstrating even the lower causation threshold as described above.

### III. Age Discrimination Claims

Snyder also claims she was discharged because of her age in violation of the Age Discrimination in Employment Act ("ADEA"). The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, it is unlawful under Maryland law for an employer to "refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . age." Md. Code Ann., State Gov't § 20-606(a)(1). Plaintiff has not asserted a meaningful distinction between her federal and state age discrimination claims. The court will thus apply the same standard to both claims. *See Avant v. S. Maryland Hosp., Inc.*, 2015 WL 435011, at *9 (D. Md. Feb. 2, 2015) (analyzing plaintiff's state law § 20-606 claim under the same paradigm as her federal ADEA claim).

Where, as in this case, there is no direct evidence of discrimination, such claims are analyzed under the three-pronged burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310–11 (1996) (assuming the *McDonnell Douglas* framework applies to age discrimination cases). Under this framework, a plaintiff must first make out a *prima facie* case of discrimination. *Avant*, 2015 WL 435011, at *4. To establish a *prima facie* case of discriminatory discharge under the ADEA, a plaintiff must prove (1) she was a member of the protected class, *i.e.*, at least 40 years old; (2) she suffered an adverse employment action; (3) she was meeting the employer's legitimate expectations at the time of her termination; and (4) she was

18

replaced by someone who is either substantially younger or outside the protected class. *Id.* at *5;
*Moore v. Bd. of Educ.*, 63 F. Supp. 2d 667, 671 (D. Md. 1999).

For the reasons set forth above, Snyder did not meet her employer's legitimate expectations
at the time of her termination given her repeated acts of insubordination and workplace disruptions.
(Pierson Aff. ¶ 8–14.) Even assuming her unsubstantiated allegations were backed by sworn
affidavits or other admissible evidence, she would not be able to demonstrate a triable issue of
fact. Snyder alleges she was asked about her retirement plans and was replaced by someone
younger than her. (Compl. ¶ 51–52.) Neither of these allegations—even if substantiated with
evidence—are sufficient standing alone to establish an age discrimination claim.

First, no reasonable jury could find a nexus between a brief question regarding Snyder's
career path—such as her intended retirement plans—and Snyder's termination. *See Avant*, 2015
WL 435011, at *8 ("Passing references to an employee's retirement plans do not, without more,
give rise to an inference of age discrimination."). Other courts have held that questions about
retirement, without more, do not establish an inference of age discrimination. *See, e.g.*, *DeBarr v.
Cleveland Clinic Found.*, 918 F. Supp. 2d 676, 683 (N.D. Ohio 2013) (finding no direct evidence
of age discrimination when supervisor allegedly asked employee when he was going to retire).[15]
Furthermore, Snyder has not explained the connection between her firing and Branham's
retirement-related inquiries given that Houck ultimately terminated her employment. (*See*

---

[15] Snyder cites *Houston v. Kirkland*, 2016 WL 7176580 (D. Md. Dec. 7, 2016) (Hazel, J.), for the opposite proposition.
Snyder ignores the facts of *Houston*, which were much more extreme than the inquiries seemingly made in passing in
the present case. There, the plaintiff faced "targeted" discrimination, supported by sworn affidavits "indicat[ing] that
these were not friendly inquiries." *Id.* at *10. Additionally, the questions about the plaintiff's retirement in *Houston*
were combined with a salary cut and comments suggesting the plaintiff was "old enough to collect social security."
*Id.* Snyder's case is much closer to *Avant v. S. Maryland Hosp., Inc.*, 2015 WL 435011, at *9 (D. Md. Feb. 2, 2015)
(Hazel, J.). In *Avant*, Judge Hazel granted an employer's motion for summary judgment on an ADEA claim where the
plaintiff "ha[d] not produced any evidence to suggest that [her supervisor's] occasional inquiries about her future
[retirement] plans were harassing or otherwise impacted her ability to perform her job functions." *Id.* at *8. Snyder
has failed to provide such evidence in the present case.

Compl. ¶ 61). The fact that several other actors, such as the MDOT/SHA Administrator and Deputy Administrator, recommended her termination also cuts against any causal connection between Branham's questions and Snyder's discharge. (*See* Pierson Aff. ¶¶ 10.)

Second, "the mere fact of replacement by a younger employee is not dispositive of age discrimination." *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) (noting the ADEA is not "akin to a strict seniority protection system"). Furthermore, Snyder's allegations regarding age discrimination by the defendants are textbook examples of conclusory statements unsupported by any evidence or factual specificity.[16]

Even if Snyder could meet the *prima facie* test for age discrimination, Snyder has not satisfied her burden of showing the defendant's justifications for terminating her employment were mere pretext. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (noting a plaintiff must provide evidence the defendants' justifications for termination are "unworthy of credence"). As described above, the Department's uncontested, non-discriminatory explanation of Snyder's termination prevents her from establishing age discrimination was the 'but for' cause of her termination. *See Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 176–77 (2009). The defendants' motion for summary judgment with respect to the age discrimination claims will be granted.

## IV. Gender-Based Retaliation and Termination Claims

### A. Retaliation Claim

Snyder contends the defendants terminated her employment in retaliation for Snyder expressing her mistreatment based on gender. (Compl. ¶ 196.)

Title VII prohibits discrimination against an employee in retaliation for the employee opposing the employer's illegal discrimination practices or participating in Title VII enforcement

---

[16] Snyder merely asserts there was "a pattern at the shop of older workers being similarly mistreated." (Compl. ¶ 51.) The only detail given is that certain employees were "forced out of [their] job[s] at the shop." (*Id.*)

proceedings. *See* 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the protected activity and adverse action. *See E.E.O.C v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). Where, as in this case, there is no direct evidence of discrimination, such claims are analyzed under the familiar three-pronged burden-shifting framework. *Id.* at 405. Under this framework, to defeat a defendant's motion for summary judgment, a plaintiff must first make out a *prima facie* case of retaliation under Title VII. *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 587 (D. Md. 2012). If the plaintiff succeeds in carrying the initial burden, then "the burden shifts to the defendant to articulate a legitimate, lawful reason for its action." *Id.* n.13 (citing *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir.2011)). Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate the given reason was a pretext for unlawful discrimination. *Id.*

Assuming without deciding that Snyder could meet the *prima facie* test, the defendants offer a legitimate reason for the adverse employment action taken, as described above. (Pierson Aff. ¶¶ 8–14.) So too here, Snyder fails to show the reason for her discharge is merely pretext. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("[A] a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."). Thus, summary judgment is appropriate as to Snyder's Title VII retaliation claim.

### B. *Discriminatory Termination Claim*

Snyder also argues her firing constitutes discriminatory termination under Title VII. To demonstrate a *prima facie* case of discriminatory termination, Snyder must show "(1) that [s]he is a member of a protected class; (2) that [s]he suffered from an adverse employment action; (3) that

. . . [s]he was performing at a level that met [her] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 219 (4th Cir. 2016) (citation omitted).

As discussed previously, no reasonable jury could find Snyder was performing at a level sufficient to meet the Department's legitimate expectations.

Snyder's allegations, even if they were backed by an affidavit, do not establish a *prima facie* case. Snyder contends Mr. Antlitz, a male employee, "missed several storms due to illness" yet was not punished. (Compl. ¶ 56.) Missing from this story is any allegation that Antlitz is similarly situated to Snyder. The evidence is clear Antlitz does not hold the same job as her; in fact, Antlitz is Snyder's supervisor. (*Id.* ¶ 21.) Accordingly, the court will grant summary judgment as to Snyder's Title VII and analogous state law claims.[17]

### V. Intentional Infliction of Emotional Distress

To establish a *prima facie* case for intentional infliction of emotional distress ("IIED"), a plaintiff must demonstrate "(1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe." *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 465–66 (D. Md. 2002). Note, "in Maryland, 'the tort of intentional infliction of emotional distress is rarely viable.'" *Id.* at 466 (citing *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997)).

---

[17] This would include dismissal of Snyder's Maryland FEPA claims. FEPA is the state law analogue of Title VII and its interpretation is guided, although not bound, by federal cases interpreting Title VII. *See Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735, 742 (2007). Therefore, for purposes of this memorandum, this court's analysis of Snyder's Title VII claims shall constitute its analysis of her FEPA claims. *See, e.g.*, *Linton v. Johns Hopkins Univ. Applied Physics Lab.*, 2011 WL 4549177, at *4 n.3 (D. Md. Sept. 28, 2011) (applying Title VII case law to pendent FEPA claims).

No reasonable jury could return a favorable verdict for Snyder on her IIED claim. "To satisfy the first element of an IIED claim, a plaintiff must demonstrate the defendant either "desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from [their] conduct, or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow." *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011) (quoting *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008). Snyder has made no allegation that Branham possibly knew of Snyder's abusive past or heightened vulnerability, or intentionally sought to bring about distress.

Furthermore, Snyder's allegations of bullying, mean-spirited communication, and raised voices do not rise to the level of "extreme and outrageous" behavior. *See Figueiredo–Torres v. Nickel*, 321 Md. 642, 653 (1991) ("Maryland courts have cautioned that the tort of intentional infliction of emotional distress should be imposed sparingly, and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'"). This cause of action "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Ky. Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992). Specifically, "workplace harassment . . . almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Arbabi*, 205 F. Supp. 2d at 466 . The unrefuted contention that defendants followed the HR guidelines throughout the entire dispute (Pierson Aff. ¶ 15) is strong evidence that neither Branham nor Houck's conduct was extreme or outrageous.

Accordingly, summary judgment is appropriate as to Snyder's claim for IIED.

## VI. Negligent Supervision and Negligent Retention

Snyder's remaining claims involve negligent supervision and negligent retention. In both claims, Snyder argues the Department violated its duty to protect her from the discriminatory conduct of her fellow co-workers. No reasonable jury could find in Snyder's favor on either of these claims.

Under Maryland law, Snyder must show she suffered an injury caused by the tortious conduct of the defendant's employees; the defendant knew or should have known its employees could inflict such harm; the defendant failed to use proper care in supervising or training its employees; and the defendant's failure was the proximate cause of plaintiff's injuries. *See Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 484 (D. Md. 1999). As described above, Snyder's supervisors did not engage in tortious conduct. Furthermore, the fact that Snyder's supervisors consulted with the HR department at every stage of her termination proceedings is strong evidence the defendants did *not* fail to use proper care in supervising and retaining their employees. (Pierson Aff. ¶ 15.)

Accordingly, summary judgment will be entered in the defendants' favor as to these tort claims.

## CONCLUSION

For the reasons discussed herein, the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 12)—construed as a motion for summary judgment—will be granted. A separate Order follows.

$\frac{3/31/22}{\text{Date}}$

_____

CCB

Catherine C. Blake
United States District Judge

24